**Electronically Filed
Supreme Court
SCAP-15-0000520
05-DEC-2017
08:06 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

HAWAI'I TECHNOLOGY ACADEMY and the DEPARTMENT OF EDUCATION,
STATE OF HAWAI'I, Appellants-Appellees,

vs.

L.E., Appellee-Appellant,

and

HAWAI'I CIVIL RIGHTS COMMISSION, Appellee-Appellant.

_____

SCAP-15-0000520

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-15-0000520; CIV. NO. 14-1-2438-11)

DECEMBER 5, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I. Introduction

This case concerns whether the Hawai'i Civil Rights

Commission ("HCRC") has jurisdiction under Hawai'i Revised

Statutes ("HRS") § 368-1.5 (1993)[1] over claims that a child ("Student") was subjected to disability discrimination and improper denial of reasonable accommodations and modifications[2] to take an on-line grade-level placement examination required of homeschooled students applying for entrance to Hawaiʻi Technology Academy ("the Academy") ("HCRC complaint").  The Academy is a public charter school within Hawaii's statewide school district and is part of the State of Hawaiʻi Department of Education ("DOE").

---

[1]     HRS § 368-1.5 (1993) provides:

> **Programs and activities receiving state financial assistance.**  (a)  No otherwise qualified individual in the State shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination by state agencies, or under any program or activity receiving state financial assistance.
>     (b)  As used in this section, the term "disability" means the state of having a physical or mental impairment which substantially limits one or more major life activities, having a record of such an impairment, or being regarded as having such an impairment.
>     (c)  As used in this section, "state financial assistance" means grants, purchase-of-service contracts, or any other arrangement by which the State provides or otherwise makes available assistance in the form of funds to an entity for the purpose of rendering services on behalf of the State.  It does not include procurement contracts, state insurance or guaranty contracts, licenses, tax credits, or loan guarantees to private businesses of general concern that do not render services on behalf of the State.

[2]  Student's parent, L.E. ("Parent"), asked for a different day Student could take the test in a room without other students with the assistance of an adult, time for a snack break, to take the test in the same manner he had taken the test at home the year prior (with approved accommodations of taking the test at home with Parent over a period of a few days), or for the school to use test scores from the test taken the year prior.

We hold the HCRC lacks jurisdiction over the HCRC complaint because the legislature intended HRS § 368-1.5 to provide the HCRC with jurisdiction over disability discrimination claims only when Section 504 of the federal Rehabilitation Act of 1973 does not apply, and Section 504 does apply to the HCRC complaint.  We therefore affirm the circuit court's final judgment.

## II.  Background

To provide context, we begin with a brief overview of federal laws protecting a child's access to a free appropriate public education ("FAPE") before discussing the factual and procedural background in this matter.

## A.    Free Appropriate Public Education ("FAPE")

Both the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et. seq., (previously known as the Education for All Handicapped Children Act), and the implementing regulations of Section 504 of the Rehabilitation Act of 1973 ("the Act"), 21 U.S.C. § 701, et. seq., 34 C.F.R. Part 104, Subpart D, ensure that children with disabilities have access to a FAPE.  The IDEA and the Section 504 regulations differ, however, regarding what constitutes a FAPE and who is entitled to one.

The "core guarantee" of the IDEA[3] is "to ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A). Under the IDEA, "special education" means "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability."  20 U.S.C. § 1401(29).  A "child with a disability"[4] is a child with at least one disability on an enumerated list,[5] and "who, by reason thereof, needs special education and related services."  20 U.S.C. § 1401(3)(A).  A "FAPE" means "special education and related services" that, among other things, "are provided in conformity with the individualized education program [("IEP")] required under section 1414(d) of this title."  20 U.S.C. § 1401(9)(D).[6]   A

---

[3]  Fry v. Napoleon Cmty. Schs., 580 U.S. ___, 137 S.Ct. 743, 748 (2017).

[4]  The IDEA provides a different definition of a "child with a disability" for a child aged 3 through 9, which is not applicable to Student.  See 20 U.S.C. § 1401(3)(B).

[5]  The list includes: "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities."  20 U.S.C. § 1401(3)(A)(i).  See also 34 C.F.R. § 300.8 (adding "deaf-blindness" and "multiple disabilities" to the list).

[6]  The definition of FAPE in the implementing regulations of the IDEA, see 34 C.F.R. § 300.17, is taken directly from the Act, and is therefore not separately discussed.  See 71 Fed. Reg. 46,582 (Aug. 14, 2006) (discussing the regulatory definition of FAPE).

team comprised of a student's parents and educators determine a student's IEP. See 20 U.S.C. § 1414(d)(1)(B).

In contrast, Section 504 of the Act generally prohibits disability discrimination: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Thus, Section 504 applies to other programs in addition to educational institutions. However, because the Act was not intended to be self-executing, see, e.g., Cherry v. Mathews, 419 F. Supp. 922, 924 (U.S.D.C. 1976), relevant federal agencies, such as the U.S. Department of Education, were mandated to promulgate regulations tailored to the particular recipients of that agency's programs. See Nancy Lee Jones, Section 504 of the Rehabilitation Act of 1973: Prohibiting Discrimination Against Individuals with Disabilities in Programs or Activities Receiving Federal Assistance, at 4 (Congressional Research Service 2009), http://www.llsdc.org/assets/sourcebook/crs-rl34041.pdf; see also 29 U.S.C. § 794(a); 34 C.F.R. § 104.1 ("The purpose of this part is to effectuate section 504 of the Rehabilitation Act of 1973 . . . .").

Therefore, Section 504 regulations promulgated by the U.S. Department of Education contain both general provisions prohibiting discrimination, see, e.g., 34 C.F.R. § 104.4(b),[7] as well as provisions specific to preschool, elementary, and secondary education, in Subpart D.  See 34 C.F.R. Part 104, Subpart D.

---

[7]  Under the Section 504 regulations, a recipient of Federal financial assistance may not:

> (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;
>
> (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>
> (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;
>
> (iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;
>
> (v) Aid or perpetuate discrimination against a qualified handicapped person by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any aid, benefit, or service to beneficiaries of the recipients program or activity;
>
> (vi) Deny a qualified handicapped person the opportunity to participate as a member of planning or advisory boards; or
>
> (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

34 C.F.R. § 104.4(b).

6

Subpart D requires, among other things, that each qualified handicapped person within the jurisdiction of a public elementary or secondary education program or activity receiving federal financial assistance be provided a FAPE by that program or activity.  See 34 C.F.R. § 104.33(a).  Under Section 504 regulations, a FAPE is defined as the "regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met."  34 C.F.R. § 104.33(b)(1) (emphasis added).  Because Section 504 regulations define a "qualified handicapped person"[8] more broadly than a "child with a disability" under the IDEA, children who may not be covered by the IDEA may be covered by Section 504.

In sum, coverage of students under the IDEA may be more limited in scope than coverage under Section 504.  However, for those students who are covered by the IDEA, the IDEA provides

_____

[8]  A "handicapped person" is "any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."  34 C.F.R. § 104.3(j).  A "qualified handicapped person" with respect to public elementary or secondary educational services, means:

> a handicapped person (i) of an age during which nonhandicapped persons are provided such services, (ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under section 612 of the Education of the Handicapped Act[.]

34 C.F.R. § 104.3(l)(2).

7

broader protections than Section 504 as the IDEA requires that specialized instruction "meet the unique needs of a child with a disability," whereas Section 504 requires only that the individual educational needs of handicapped persons be met "as adequately as the needs of nonhandicapped persons are met." Because of the IDEA's additional protections, providing a FAPE under the IDEA meets the standards of providing a FAPE under Section 504.  See 34 C.F.R. § 104.33(b)(1).

**B.   Procedural Safeguards**

The IDEA requires local educational agencies that receive federal assistance to "establish and maintain procedures in accordance" with 20 U.S.C. § 1415 "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agencies."  20 U.S.C. § 1415(a).  Specific required procedures include, but are not limited to, providing parents an opportunity to examine a student's records, written notification to the parents regarding any changes as to how FAPE would be provided to a student, and an opportunity for mediation or to file a due process complaint notice for an impartial due process hearing conducted by the State educational agency.  See generally 20 U.S.C. § 1415.

Similarly, the Section 504 regulations pertaining to schools also require procedural safeguards:

> A recipient that operates a public elementary or secondary education program or activity shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.

34 C.F.R. § 104.36. These standards can be met by compliance with the procedural safeguards requirements of the IDEA. See id.

C.    **Factual Background**

Student, who was thirteen years old in 2014, was born with Trisomy 21, also known as Down syndrome. Student has mild bilateral hearing loss, wears corrective lenses to read, and has also been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), hypotonia (low muscle tone), and dysphagia (swallowing disorder). The DOE found Student eligible for special education services in 2003.

Student attended the Academy from 2008 to 2012 and received special education and related services. In May 2011, Student's IEP team recommended that Student be placed at a public elementary school offering daily face-to-face classes, which contrasted with the Academy's hybrid face-to-face and on-line

learning environment. Parent challenged that recommendation and requested a due process hearing before an impartial hearing officer pursuant to the IDEA, 20 U.S.C. § 1415(f)(1)(A), (f)(3)(a)(i). Student remained at the Academy for the 2011–2012 school year during the administrative proceedings. On May 21, 2012, an administrative hearing officer affirmed the May 2011 decision by Student's IEP team.

Ten days later, on May 31, 2012, the Academy sent Parent a letter stating that the Academy would be implementing the May 2011 IEP and advised Parent to enroll Student at He'eia Elementary, Student's geographic home school. By letter dated June 12, 2012, the Academy notified Parent that Student would no longer be able to attend the Academy as of June 18, 2012, the Academy's school-wide withdrawal date. On June 15, 2012, Parent hand-delivered to the Academy and the DOE a revocation of her consent for special education and related services to Student. Parent also sent an e-mail to the Academy and the DOE stating that as a consequence of her revocation, she expected Student to remain at the Academy as a "regular education student." The Academy, however, withdrew Student from enrollment on June 18, 2012.

On June 20, 2012, the same date as Parent's deadline for appealing the administrative hearing officer's decision, the

Academy issued a written notice stating that Student's special education and related services would be terminated upon Parent's receipt of the notice. Parent received the written notice on June 22, 2012. By letter dated July 25, 2012, the Academy stated that Parent's revocation of special education and related services did not take effect until June 20, 2012, the date of the written notice.

Parent then applied Student for enrollment as a general education student for the 2012–2013 academic year. Student was permitted to take the required grade-level placement test at home with Parent over several days in September 2012. Student was ultimately waitlisted, and Parent homeschooled Student for the 2012-13 school year.

Parent again applied Student for admission to the Academy for the 2013–2014 academic year. Parent requested accommodations or modifications to the Academy's grade-level placement test requirement, such as allowing use of the previous year's test scores, allowing Student to take the test at home as he had done the previous year, allowing Student to take the test alone in a room with an adult, or providing Student additional time for a snack break.

Parent took Student to the Academy campus during scheduled test times in May 2013 and July 2013. Parent was informed by

11

the Academy's director that because Parent had revoked consent to the IDEA and the IEP, the Academy would not be able to give Student any accommodations or supports. Student was unable to complete the test. Specifically, according to Parent, Student needed help being focused and directed question by question, but he was not given a one-to-one aide during the test. As a result, Student was unable to complete the test because he was distracted and ended up going on the internet instead. According to Parent, Student's enrollment application was discarded as insufficient because he was not able to take the test due to his disabilities; his application was therefore not processed.

Student was again homeschooled during the 2013-2014 academic year. In July 2014, when Student would have chronologically been a ninth grader, Parent and the Academy agreed to enroll Student as a sixth grade general education student, where he received some services through a Section 504 plan. By June 2015, Student was given a new IEP that placed him at a different school. Parent thereafter withdrew Student from the Academy.

**D. IDEA and Section 504 Claims in United States District Court**

Meanwhile, on June 20, 2012, two days after the Academy's schoolwide withdrawal date and the termination date for

12

Student's special education services based on Parent's revocation of consent, as deemed by the Academy, and after exhausting administrative remedies, Parent filed an IDEA complaint in the United States District Court for the District of Hawai'i, arguing the May 2012 decision of the administrative hearing officer — that Student's appropriate placement to receive a FAPE was at He'eia Elementary, not the Academy — should be reversed.  See Jason E. v. Dep't of Educ., Civ. No. 12-00354 ACK-BML.  By order dated February 14, 2013, the federal district court ruled the complaint moot because Parent had revoked consent for Student to continue receiving IDEA special education services.  However, the court permitted Parent to amend the complaint to reflect her intent for Student to be treated as a general education student at the Academy.

Parent filed a first amended complaint on March 19, 2013, reflecting that intent.  Parent's May 10, 2013 second amended complaint asserted that she revoked consent for the continued provision of special education and related services to determine whether Student would benefit from a general education program at the Academy with or without Section 504 reasonable modifications.  On May 7, 2014, Parent filed a third amended complaint, alleging in part: (1) the DOE and the Academy should have honored the revocation of consent by treating Student as a

13

general education student and continuing his enrollment at the Academy; and (2) the DOE and the Academy violated Section 504 and Title II of the Americans with Disabilities Act of 1990 when Student, by reason of his disability, was released as a student and no longer had access to the general education curriculum at the Academy. At a hearing before the federal district court, Parent clarified that the relief sought was for Student to receive a FAPE at the Academy as a general education student.

By order dated November 20, 2014, the federal district court granted the defendants' motion to dismiss the third amended complaint. The court deemed the third amended complaint moot because Student was already enrolled as a general education student at the Academy and because the Academy had provided Student a FAPE through a Section 504 Plan. In the alternative, on the merits, the court ruled in part that federal regulations do not expressly require that a disabled student remain at the same school after a parent revokes IDEA consent; rather, the regulations leave open the possibility that a student may be placed in a different school as a general education student. The federal district court also concluded Parent only provided conclusory statements that the accommodations she requested for Student were reasonable or that the Section 504 Plan was deficient.

14

**E.     Pre-complaint Questionnaire and Petition for Declaratory Relief**

While Student was still being homeschooled during the 2013-2014 school year after not being able to complete the Academy's placement examination, on January 14, 2014, Parent submitted a pre-complaint questionnaire to the HCRC alleging disability discrimination based on the Academy's alleged failure to provide reasonable accommodations for the examination.  On February 10, 2014 the HCRC's Executive Director ruled the HCRC lacked jurisdiction over Parent's claim.  By letter dated April 21, 2014, Parent submitted a petition to the HCRC, asserting the HCRC has jurisdiction to review her complaint alleging disability discrimination when Student's application to the Academy for the 2013–2014 school year was denied based on his inability to complete the grade level placement test; Parent alleged the Academy denied Student reasonable accommodations or modifications required based on Student's disability.  On July 25, 2014, the Executive Director submitted a memorandum in opposition.  For purposes of addressing jurisdiction, the Executive Director assumed that Student was "an otherwise qualified individual with a disability and that he was unable to complete the required test because of his disability."  The Executive Director opined, however, that because publicly funded educational institutions are not "public accommodations," the

15

HCRC lacked jurisdiction under HRS § 368-1 (Supp. 2011).[9] The Academy and the DOE also opposed the petition based on lack of subject matter jurisdiction.

The HCRC held an oral argument on August 18, 2014, after Student had been re-enrolled at the Academy. Parent focused on Student's need to learn effective communication through sign language. She explained that the Academy's grade-level placement test requires communication skills and the ability to be seated, which was something Student could not master. Parent argued that despite her revocation of special education and related services, Student was entitled to disability accommodations and supports during the placement test.

Parent conceded the Academy had already eliminated its grade-level admission test policy and that Student was then currently attending the Academy. However, neither the Executive Director nor the Academy and DOE argued mootness. Instead, the Executive Director focused on the legislative purpose behind HRS § 368-1.5, and argued that for two reasons, it was necessary to examine the legislative history of HRS § 368-1.5. According to the Executive Director, first, nothing in Chapter 368 defines

_____

[9] HRS § 368-1 states in relevant part: "The legislature finds and declares that the practice of discrimination because of race, color, religion, age, sex, including gender identity or expression, sexual orientation, marital status, national origin, ancestry, or disability in employment, housing, public accommodations, or access to services receiving state financial assistance is against public policy." HRS § 368-1.

16

"program or activity" or "state agency."  Second, as the legislature had opted to leave out language from HRS § 368-1.5 that was present in Section 504, it was unclear whether the manner in which Section 504 and its implementing regulations define those same terms should apply to HRS § 368-1.5.  The Executive Director also argued that the legislature did not supplant or supplement existing University of Hawai'i and DOE procedures for handling discrimination claims, and that if the HCRC did indeed have jurisdiction over claims such as those in the petition, extensive rulemaking would be required to not wreak havoc on the current system.

The Academy and the DOE argued the petition was essentially a special education matter under the IDEA.  They further argued the DOE had extensive administrative rules governing IDEA and Section 504 claims, and that HRS § 368-1.5 does not require the State to implement Section 504.  Counsel also argued that if an HRS § 368-1.5 violation provided the HCRC with jurisdiction over any disability discrimination claim, then language specifically identifying the areas of the HCRC's jurisdiction — employment, real estate, and public accommodations — would be superfluous.

The HCRC decision characterized the dispute as one in which Parent sought a disability accommodation for Student, but was denied:

17

> During the application process, [Parent] sought an accommodation from [the Academy] in the form of extra time for [Student], who was otherwise qualified for admission to [the Academy], to complete a grade-level placement exam. [The Academy] denied the requested accommodation, and because [Student] did not complete the placement assessment in the time provided, [the Academy] denied his application for admission.

In its Decision and Order dated October 28, 2014, the HCRC determined it lacked jurisdiction under HRS § 368-1 over Student's claim regarding the denial of reasonable accommodations, as the Academy was not a "place of public accommodation." The HCRC then determined, however, that it nevertheless had jurisdiction over Parent's claim under HRS § 368-1.5, as the Academy was a state agency or a "program or activity receiving state financial assistance." The HCRC examined the plain language of various sections of Chapter 368, and noted HRS § 368-17(a)(3) provides a remedy of "[a]dmission of persons to a public accommodation or an educational institution," and ruled the existence of the remedy of admission to educational institutions would be absurd without the existence of a right under HRS § 368-1.5. Moreover, the HCRC asserted that if HRS § 368-1.5 did not apply to public schools, then families whose children were excluded from or otherwise discriminated against by public schools would be unable to file complaints of discrimination with the HCRC. Further, according to the HCRC, if the HCRC cannot accept the complaint, it cannot issue a right to sue letter and if a person cannot get a right

to sue letter, she cannot file suit in state court — or in any court — to obtain the remedies provided in HRS § 368-17 for the discriminatory exclusion.

The HCRC deemed it unnecessary to do so but nevertheless went on to examine the legislative history of HRS § 368-1.5. It asserted that despite the legislature's intent to model HRS § 368-1.5 on Section 504, the legislative history of Section 504 did not bear on the legislative purpose in enacting HRS § 368-1.5. Rather, according to the HCRC, the legislative history behind subsequent amendments to HRS § 368-1.5 reflected the legislature's intent to vest the HCRC with enforcement authority over all cases under HRS § 368-1.5, which the HCRC characterized as Hawaii's "Section 504 analog."

The HCRC decision did not address whether any federal remedies interacted with HRS § 368-1.5 or whether the HCRC's jurisdiction would be affected by federal law or existing DOE complaint procedures.

**F. Circuit Court Proceedings**

The Academy and the DOE timely appealed to the circuit court. After the parties submitted their briefs, oral argument was held.

The circuit court reversed the HCRC decision, ruling as follows:

> After carefully reviewing the entire record on appeal and considering the written submissions and arguments of the parties, the Court finds and concludes that pursuant to Hawai'i Revised Statutes §91-14(g)(2), the Hawai'i Civil Rights Commission acted in excess of its statutory authority and/or jurisdiction under Hawai'i Revised Statute §368-1.5 by asserting jurisdiction over [Parent's] discrimination claim against the Department of Education and Hawai'i Technology Academy.

## G.   The Current Appeal

The HCRC timely filed its notice of appeal with the ICA; the appeal was then transferred to this court.  The HCRC argues in its opening brief that public charter schools, such as the Academy, are "state agencies" or "programs or activities receiving state financial assistance" under HRS § 368-1.5.  The HCRC also argues the legislature did not intend to exclude public educational institutions from HRS § 368-1.5's coverage. It asserts HRS § 368-1.5 is the state counterpart to Section 504, which at the time of § 368-1.5's enactment covered public educational institutions, and which required such institutions to make reasonable accommodations.  The HCRC emphasizes legislative history stating HRS § 368-1.5 was "intended to extend the protection provided by Section 504 to State financed programs" in the areas of "employment, housing, education, access to services, and public accommodations."  (quoting H. Stand. Comm. Rep. No. 819, in 1989 House Journal, at 1140 and citing an attachment to the testimony of Nancy S. Partika, Director of the Governor's Committee on AIDS).

20

The HCRC also asserts Section 504 does not preempt HRS § 368-1.5 because nothing in Section 504 prohibits states from enacting state laws to prohibit disability discrimination by state agencies or state-funded programs and because compliance with and enforcement of both Section 504 and HRS § 368-1.5 is possible.  Further, it argues the HCRC would not evaluate the content of "pure Section 504 academic special education instructional plans and related accommodations."  According to the HCRC, its enforcement of HRS § 368-1.5 would only overlap with the DOE's enforcement of non-academic accommodations under Section 504.

The HCRC acknowledges it lacks jurisdiction over student complaints under the IDEA and/or accommodations relating to IEPs because neither HRS § 368-1.5 nor its legislative history indicate it was meant to apply to benefits and programs provided under the IDEA.  The HCRC argues, however, that there is nothing that prevents a student from pursuing remedies under both the IDEA and HRS § 368-1.5.  The HCRC also observes that there is no conflict between HRS § 368-1.5 and statutes governing Hawai'i public charter schools or the DOE's administrative rules governing its "Civil Rights Policy and Complaint Procedure."

The Academy and the DOE concede in their answering brief that public charter schools are "state agencies," but argue HRS

21

§ 368-1.5 does not apply to state agencies that also receive federal funds.  The Academy and the DOE interpret the statement in the House Standing Committee Report that "[t]his measure is intended to extend the protection provided by Section 504 to State financed programs," to mean that "the Legislature intended to provide Section 504-type protections only to those state agencies that were not already covered by Section 504." (emphasis added).

In addition, the Academy and the DOE also note that within the educational context, there is no bright line distinction between a "non-academic" and "academic" modification, accommodation, or service, because the failure to provide a student with a necessary modification, accommodation, or service pursuant to Section 504 directly impacts the student's ability to receive a FAPE.

### III.  Standards of Review

**A.    Interpretation of a Statute**

Statutory interpretation is a question of law reviewable de novo.  See Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007) (citation omitted).  When construing statutes, the court is governed by the following rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and

22

unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

When there is ambiguity in a statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent, such as legislative history, or the reason and spirit of the law.

114 Hawai'i at 193-94, 159 P.3d at 152-53 (citations omitted).

## B.   Administrative Agency Appeals

Ordinarily, deference will be given to decisions of administrative agencies acting within the realm of their expertise.  The rule of judicial deference, however, does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose. Consequently, we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation.

Coon v. City & Cnty. of Honolulu, 98 Hawai'i 233, 245, 47 P.3d

348, 360 (2002) (citations and brackets omitted).

## IV.   Discussion

## A.   Preliminary Issues

Preliminarily, we note that Student was admitted to and re-enrolled at the Academy for the 2014-2015 academic year.  Parent subsequently voluntarily withdrew Student by July 2015. Possible mootness was not, however, argued by the Academy or DOE.  In any event, the question of whether the HCRC has jurisdiction over the HCRC complaint is one that affects the

23

public interest and is "capable of repetition yet evading review." Okada Trucking Co. v. Bd. of Water Supply, 99 Hawai'i 191, 196, 53 P.3d 799, 804 (2002) (citations omitted). Accordingly, even if mootness had been raised, the jurisdictional question raised presents an exception to the mootness doctrine and we proceed to address the issue.

HCRC asserts that provision of services to the disabled for school placement examinations is a "non-academic" accommodation over which it has jurisdiction under HRS § 368-1.5. Whether an accommodation is "academic" or "non-academic," as those terms are used by the HCRC, may not affect whether that accommodation is necessary to a FAPE under Section 504. For example, the HCRC provides the following illustrations of "non-academic" accommodations: "if a public high school student with a mobility impairment requested additional time to get to his or her next class," "if a child needs a ramp," or "if a child . . . needs materials in large print." These accommodations, however, also relate to the provision of a FAPE under Section 504, and therefore concern a student's education or academics. See 34 C.F.R. § 104.33(b)(1) (defining a FAPE under Section 504 as the "regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped

24

persons are met.").  Thus, it is not clear whether the distinction made by the HCRC has merit.  In any event, based on the analysis in the next section, any distinction along these lines is irrelevant.

**B.   The legislature intended for HRS § 368-1.5 to apply to schools only when Section 504 is inapplicable.**

We hold that based on the following analysis of the legislative history of HRS Chapter 368 and HRS § 368-1.5, the legislature did not intend the HCRC to have jurisdiction over disability discrimination claims if Section 504 protections are applicable.  In this case, because Section 504 protections apply to the HCRC complaint, the HCRC lacks jurisdiction.

**1.   Formation of the HCRC**

The HCRC was formed by Act 219 of 1988 to "establish a civil rights commission to enforce the State's laws which prohibit discrimination on the basis of race, color, religion, age, sex, marital status, national origin, ancestry, physical handicap, or medical condition in employment, housing, or public accommodation."  H. Stand. Comm. Rep. No. 387-88, 1988 House Journal, at 991.  The legislature explained the need for a commission focused solely on discrimination complaints:

> Presently, statutorily mandated enforcement responsibilities for the State's discrimination laws are divided primarily among several agencies within the department of labor and industrial relations and the department of commerce and consumer affairs.  Enforcement of discrimination laws is only one of many other important

> functions of these departments and the enforcement programs must compete with other departmental programs for priority status. Typically, the enforcement agencies are hampered in their delivery of services because of limited fiscal and personnel resources.

H. Stand. Comm. Rep. No. 660-88, 1988 House Journal, at 1081; see Conf. Comm. Rep. No. 165-88, in 1988 House Journal, at 845, 1988 Senate Journal, at 717. Act 219 created HRS Chapter 368 and the "General Provisions" governing the HCRC (now Part 1 of Chapter 368). See 1988 Haw. Sess. Laws Act 219, § 1 at 386-88. The General Provisions included HRS § 368-1 (Purpose and intent), HRS § 368-2 (Civil rights commission established), HRS § 368-3 (Powers and functions of commission), HRS § 368-4 (Records; reporting requirements), and HRS § 368-5 (Penalties). See id.

Act 219 directed the State Legislative Auditor to "conduct a review of all state discrimination laws and the current policies, procedures, and staffing of the respective state departments and agencies" and report to the legislature with its findings and recommendations. 1988 Haw. Sess. Laws Act 219, § 3 at 388.

### 2. 1989 Amendments through Act 386

In early January 1989, the State Legislative Auditor submitted a report to the Governor and the legislature entitled, "A Study on Implementation of the Civil Rights Commission for the State of Hawaii." The report provided an initial analysis

of the HCRC and made several recommendations for creating a uniform procedure for enforcement.  The legislature then passed Act 386 "to implement Chapter 368, Hawaii Revised Statutes, which created a civil rights commission to provide a uniform procedure for handling all types of discrimination complaints, to provide funding[] and staffing authorization necessary for the civil rights commission to begin operations as intended by the 1988 Legislature, and to more effectively enforce the State's discrimination laws."  H. Stand. Comm. Rep. No. 1064, 1989 House Journal, at 1226.

Act 386 amended HRS Chapter 378 (Employment Practices), HRS Chapter 489 (Discrimination in Public Accommodations), and HRS Chapter 515 (Discrimination in Real Property Transactions) to give the HCRC authority to handle discrimination complaints under those chapters.  See 1989 Haw. Sess. Laws Act 386, §§ 2-4, 8-26 at 1105-13.  HRS §§ 368-2, -3, and -4 were amended to reflect this new authority.  See 1989 Haw. Sess. Laws Act 386, § 5-7 at 1106-07.

Act 386 also created "Remedies" for the HCRC (now Part II of Chapter 368), including HRS § 368-11 (Complaint against unlawful discrimination); HRS § 368-12 (Notice of right to sue); HRS § 368-13 (Investigation and conciliation of complaint); HRS § 368-14 (Commission hearings); HRS § 368-15 (Compliance

27

review); HRS § 368-16 (Appeals; de novo review; procedure); and HRS § 368-17 (Remedies). See 1989 Haw. Sess. Laws Act 386, § 1 at 1102-05.

### 3. 1989 Amendments through Act 387

In 1989, the legislature also passed Act 387. Act 387 added "access to services" to the purpose and intent under HRS § 368-1: "The legislature finds and declares that the practice of discrimination because of race, color, religion, age, sex, marital status, national origin, ancestry, or handicapped status in employment, housing, public accommodations, or access to services receiving state financial assistance is against public policy." 1989 Haw. Sess. Laws Act 387, § 1 at 1114.

Act 387 also added what is now codified as HRS § 368-1.5, the subject of this appeal, using language very similar to Section 504:

> (a) No otherwise qualified individual in the [S]tate shall, solely by reason of his or her handicapped status, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination by State agencies, or under any program or activity receiving State financial assistance.
>
> (b) As used in this section, the term "handicapped status" means the state of having a physical or mental impairment which substantially limits one or more major life activities, having a record of such an impairment, or being regarded as having such an impairment.
>
> (c) As used in this section, "State financial assistance" means grants, purchase-of-service contracts, or any other arrangement by which the State provides or otherwise makes available assistance in the form of funds to an entity for the purpose of rendering services on behalf of the State. It does not include procurement contracts, state insurance or guaranty contracts, licenses, tax credits, or loan

28

> guarantees to private businesses of general concern that do not render services on behalf of the State.

1989 Haw. Sess. Laws Act 387, § 2 at 1114-15.

### a.   Standing Committee Reports on Act 387

The Senate Standing Committee Report contains little discussion regarding the intended scope of the HCRC's jurisdiction under HRS § 368-1.5, but does clarify that Act 387 was not meant to extend to private businesses receiving no state funding. See S. Stand. Comm. Rep. No. 1326, 1989 Senate Journal, at 1304. The House Standing Committee Report, however, elucidates that Act 387 was intended to provide the HCRC with jurisdiction only in areas not covered by Section 504:

> The purpose of this bill is to extend civil rights guarantees to handicapped individuals impacted by programs receiving state funds. . . . Additionally, the practice of discrimination in access to public services is added to the list of acts declared to be contrary to public policy.
>
> Your Committee received favorable testimony from the Governor's Committee on AIDS, the State Planning Council on Developmental Disabilities, the Hawaii Center for Independent Living, the Department of Health and the Commission on the Handicapped.
>
> Your Committee finds that Section 504 of the Federal Rehabilitation Act prohibits discrimination under any program or activity receiving federal financial assistance. This measure is intended to extend the protection provided by Section 504 to State financed programs, and establishes investigation and enforcement mechanisms within the State Civil Rights Commission.

H. Stand. Comm. Rep. No. 819, 1989 House Journal, at 1140.

The concern identified in the report is the lack of "protection provided by Section 504 to State financed programs." Additionally, nothing in the report indicates that State

protection is needed for federally funded programs.  Therefore, "extend" can only mean to provide coverage to, and was not meant to also encompass federally funded programs already subject to Section 504.  The testimony cited to in the report also reflects this understanding of the Act.  See infra Part IV.B.3.b..

### b.    Testimony regarding Act 387

The House Judiciary Committee, the House Committee on Health and Human Services, and the Senate Judiciary Committee received testimony regarding H.B. 932, later enacted as Act 387. All of the testimony was in support of H.B. 932.  Much of the testimony demonstrated a basic understanding that H.B. 932 would "extend" the protection provided by Section 504, and would only apply when Section 504 did not.  The testimony conflicts with the HCRC's interpretation that the legislature intended to create "Hawaii's § 504 analog" that would also encompass Section 504 claims.

For example, testimony from the Director of the Governor's Committee on AIDS, relied on by the HCRC to support its position, stated:

> Currently, Section 504 prohibits discrimination under any program or activity receiving federal financial assistance. This applies to all State government programs, and to private agencies receiving federal funds through a State program, as well as to private agencies receiving federal funds directly from the federal government.  It is not clear, however, that private agencies receiving only State financial assistance are subject to the nondiscrimination provisions of Section 504.  State contracts using solely State funds do not include the nondiscrimination language

of Section 504.  HB 932, HD 1 will clearly extend the concept of not tolerating discrimination by reason of handicap to any program receiving State funds, and establishes investigation and enforcement mechanisms at the State level.

(emphases added).

The Director's comment that "[i]t is not clear . . . that private agencies receiving only State financial assistance are subject to the nondiscrimination provisions of Section 504" is critical to understanding the testimony's use of "extend."

The concern regarding lack of remedies against state agencies or programs and activities that do not receive federal funds (and therefore not subject to Section 504) was reiterated in testimony to House and Senate Committees from multiple parties.  For example, as the Department of Health testified before the Senate Committee:

> We note that programs and activities of the State and of other agencies which receive Federal financial assistance currently must provide services or opportunities without excluding people also on the basis of their race, color, national origin, or age, in addition to handicap. For some, sex is also a protected factor.
>
> The creation of Chapter 368 last year clearly indicated that it is against public policy to discriminate because of race, color, religion, age, sex, marital status, national origin, ancestry, handicapped status, or medical condition in employment, public accommodations, and housing. . . .
>
> Therefore, we propose that HB 932, HD 2, be amended to clarify and reflect this public policy in State programs and activities and in programs and activities receiving State financial assistance. . . .

In other testimony before the House Judiciary Committee, the Department of Health stated, "We support these extensions."

31

Similarly, before the House Health and Judiciary Committees, the Department of Health explained, "The additions use the phrasing found in Section 504 of the federal Rehabilitation Act of 1973 and in Section 504 implementing regulation.  As such we are familiar with its meaning and agree that it would be a significant addition to the protections against discrimination." (emphasis added).

As another example, the Protection and Advocacy Agency of Hawaii's testimony stated, "According to 29 U.S.C [§] 794, individuals with handicapping conditions shall not be discriminated against because of their handicap in services, programs or activities receiving Federal financial assistance. This bill would ensure the same guarantees to disabled individuals in all programs and services receiving state financial assistance."  (emphasis added).  The ACLU of Hawaii's testimony echoed this view:  "[A]s state government increasingly contracts for services with private agencies, there are an increasing number of agencies that do not receive any federal funds but whose programs are funded in large part by state grants."  So, too, did the testimony by the Commission on the Handicapped:

> The federal [Section 504] law applies to programs and activities which receive federal financial assistance and precludes those programs and activities from discriminating against qualified handicapped individuals. . . .

> We believe that it is of prime importance for the State of Hawaii to demonstrate the same commitment to equality for persons with disabilities by adopting similar language in State law.  This law would bind recipients of state financial assistance to the same standards as current recipients of federal financial assistance.

In sum, this testimony reflects the House Committee Report's intention that Act 387 was meant to provide protection for disability discrimination only when federal Section 504 protections did not apply.  There is no mention of providing overlapping jurisdiction between Act 387 and Section 504 or offering an additional state remedy to those who are already protected by Section 504.

### 4.    1991 Amendments through Act 252

Act 252 of 1991 clarified the provisions of Chapter 368 that relate to contested case hearings and appeal procedures, explaining:

> The legislature has established the Hawaii civil rights commission to create a mechanism which would provide a uniform procedure for the enforcement of the state's laws prohibiting discrimination in employment, housing, and public accommodations.  The legislature finds that in implementing its legislative mandate, there are ambiguous and inconsistent provisions.

1991 Haw. Sess. Laws Act 252, § 1 at 549.  Act 252 was not intended to substantively change chapter 368 or increase or decrease the rights provided under HRS chapters 489 and 515 and part I of chapter 378.  See id.

**5. The above legislative history shows that HRS § 368-1.5 was intended to be gap-filling.**

This legislative history demonstrates the legislature intended HRS § 368-1.5 to provide the HCRC with jurisdiction over disability discrimination complaints only when federal protections under Section 504 do not apply. The committee reports and testimony regarding Act 387 were concerned with scenarios in which disabled individuals lacked legal protections from discrimination, but that concern is not present where Section 504 applies. Moreover, there is no suggestion in the legislative history that the legislature wanted to provide an alternative state remedy in situations where federal remedies already existed. In other words, HRS § 368-1.5 was designed to be gap-filling, rather than to offer overlapping state and federal protection against disability discrimination.

Based on the legislative history, we infer the legislature intended to extend this gap-filling protection to "state agencies" in addition to "any program or activity receiving state financial assistance." HRS § 368-1.5. By 1989, when Act 387 was enacted, it was clear that Section 504 applied to any entity receiving federal funding, including state agencies. Thus, the same rationale for extending Section 504 protections would apply to state agencies not receiving federal funding.

34

This interpretation of HRS § 368-1.5 is also compatible with the inclusion of language regarding "[a]dmission of persons to . . . an educational institution" in HRS § 368-17(a)(3). HRS § 368-17 provides remedies for all of the enumerated types of discrimination in HRS § 368-1, not just disability. Accordingly, the HCRC's assertion that the remedy in HRS § 368-17(a)(3) would be superfluous if it did not imply that HRS § 368-1.5 provides coverage to educational institutions receiving both federal and state financial assistance, lacks merit. Without HRS § 368-17(a)(3), a person who is denied admission to a school on the basis of race, color, religion, age, etc., would be without a remedy. Thus, contrary to the HCRC's position, HRS § 368-17(a)(3) is not superfluous.[10]

We conclude HRS § 368-1.5 was intended to be a gap-filling measure. Here, Parent's petition asserts that when Student took the 2013 grade-level placement exam, Student was deprived of accommodations or modifications that would have allowed him to take the same test given to nonhandicapped students, which is subject to Section 504. See 34 C.F.R. § 104.33(a), (b)(1) (stating that a child with a disability is entitled to "regular

---

[10] Because the issue is not before us, we do not address whether HRS § 368-1.5 provides the HCRC with jurisdiction over disability discrimination claims against educational institutions when Section 504 does not apply, such as state agencies not receiving federal funding that may provide educational services or private schools receiving state financial assistance that do not receive federal funds.

35

or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met"). Accordingly, the HCRC lacks jurisdiction over the petition because the Academy is administered by the DOE, which receives federal funds and is therefore subject to Section 504.[11]

## V.  Conclusion

For the foregoing reasons, we hold the HCRC lacks jurisdiction over the Petition. We therefore affirm the circuit court's Final Judgment dated July 6, 2015, entered pursuant to its July 6, 2015 "Order Reversing the Hawaiʻi Civil Rights Commission's Decision and Order, Filed October 28, 2014."



| | |
|---|---|
| Livia A. Wang and Lowell K.Y. Chun-Hoon for appellant Hawaiʻi Civil Rights Commission | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Douglas S. Chin, Holly T. Shikada, Carter S. Siu, and Gregg M. Ushiroda for appellees Hawaiʻi Technology Academy and the Department of Education, State of Hawaiʻi | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

---

[11] The Academy and the DOE had also argued before the HCRC and the circuit court that the HCRC lacked jurisdiction over L.E.'s petition because the petition was essentially a special education matter under the IDEA. That argument was not specifically addressed below, and the issue is not now before this court. In any event, the U.S. Supreme Court has already issued some guidance for analyzing whether the gravamen of a complaint seeks relief for the denial of a FAPE. See Fry v. Napoleon Cmty. Schs., 580 U.S. ___, 137 S.Ct. 743, 748 (2017).